UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal Case No.  3:11-cr-183 |
| | : | Civil Case No.      3:14-cv-101 |
| vs. | : | |
| | : | Judge Timothy S. Black |
| PAUL DAVID MUSGRAVE, | : | |
| | : | |
| Defendant. | : | |

ORDER DENYING DEFENDANT'S MOTION FOR RELIEF
PURSUANT TO 28 U.S.C. § 2255 (Docs. 186, 211)

This case is before the Court on Defendant's motion to vacate and set aside the judgment and sentence pursuant to 28 U.S.C. § 2255 (Docs. 186, 211), as well as the parties' responsive memoranda (Docs. 200, 201).

Defendant raises three claims of ineffective assistance of counsel as grounds for his motion to vacate. (Doc. 186). For the reasons set forth below, the Court denies Defendant's motion with prejudice under the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). Further, the Court declines to hold an evidentiary hearing, as the record conclusively shows that Defendant is not entitled to relief. *See* 28 U.S.C. § 2255(b); *United States v. Valentine*, 488 F.3d 325, 333 (6th Cir. 2007).

**I.  BACKGROUND**

In 2008, Defendant Paul David Musgrave became involved in a tire-recycling venture. (Doc. 6 at 2). To purchase the necessary equipment, Defendant was referred to Rubber Solutions, an Australian company owned by Raymond Goldberg. (*Id*. at 3). Defendant and Goldberg decided to pursue the venture together, forming Dayton

International Tire Recycling ("DITR"), in Troy, Ohio. (*Id*. at 2). Pursuant to the Operating Agreement, Defendant held an 81% ownership interest in DITR, while Goldberg's wholly owned shell corporation, Intercontinental Trading British Virgin Islands ("ITBVI"), owned the remaining 19%. (*Id*.)

The parties agreed that DITR would purchase the equipment from Rubber Solutions for $2.3 million. (Doc. 6 at 2). Defendant invested approximately $300,000 of his own money while Goldberg's contribution was a $350,000 cost reduction in lieu of an investment of cash. (*Id*. at 3). Defendant obtained the remaining $1.7 million needed by securing a Small Business Administration ("SBA") guaranteed loan to DITR through Mutual Federal Savings Bank ("MFSB"). (*Id*. at 3-4).

In order to have the loan proceeds disbursed to Rubber Solution's bank in Australia, Defendant was required to obtain an international letter of credit. (Doc. 119 at 48). Defendant applied for a letter of credit with U.S. Bank, and when choosing the terms, he selected "partial shipments not allowed." (*Id*. at 48-49; Doc. 120 at 7; Doc. 143 at 113). Therefore, disbursement of the funds was made contingent upon all items of equipment being sent in one shipment. (Doc. 119 at 48-49; Doc. 120 at 7-8).

In May 2009, all of the equipment arrived in Troy, Ohio, except the tire shredder, which was the most important (and the most expensive) piece of equipment. (Doc. 143 at 19-20, 119). However, while the shipment was en route, U.S. Bank was misled into honoring the letter of credit and transferring the $1.7 million to Rubber Solutions's bank despite the failure to abide by the condition that "partial shipments not allowed." (*Id*. at 100, 110, 119). Rubber Solutions, however, was overdrawn in its accounts.

(Doc. 127 at 54).  Therefore, Rubber Solutions's bank seized the majority of the $1.7 million as soon as it arrived and allocated it against the overdraft. (*Id.*)  Goldberg used the remainder to pay his creditors. (*Id.*)  Thus, the $1.7 million proceeds of the loan to be used for DITR's equipment was gone, and Defendant lost his $300,000 investment in the failed venture.

Defendant contacted the FBI, the SBA Office of Inspector General, the SEC, and Australian authorities to report that Goldberg had defrauded him.  (Doc. 143 at 131-32). Defendant's calls prompted the FBI to commence an investigation.  (Doc. 182 at 26-27). However, the investigation revealed that, in the process of obtaining the loan, a number of material facts relating to the business were either not disclosed or misrepresented, such as Goldberg's involvement on both sides of the transaction (*i.e.*, his ownership of the seller, Rubber Solutions, and his corporation's co-ownership of the purchaser, DITR), Rubber Solutions's cost reduction in lieu of a cash injection from ITBVI, and the actual plans for shipment of the equipment.  (Doc. 6).

On December 13, 2011, Defendant and Goldberg were charged in a fifteen-count indictment.  (Doc. 6).  Defendant was charged with conspiracy to commit wire fraud, bank fraud, and submit a false loan application (Count 1); wire fraud (Counts 2-12); bank fraud (Count 13); and making false statements on a loan application (Counts 14-15). (*Id.*) Defendant's co-conspirator, Raymond Goldberg, was charged with conspiracy under Count 1 of the Indictment. (*Id.*)  However, in exchange for his cooperation, Goldberg subsequently entered into a plea agreement and pled guilty to the lesser offense of misprison of a felony.  *See United States v. Goldberg*, Case No.: 3:13-cr-010 (S.D. Ohio

Jan. 22, 2013). Pursuant to a Rule 11(c)(1)(C) plea agreement, the Court sentenced Goldberg to probation only. (*Id.*)

On January 17, 2013, shortly before trial, the Government dismissed five of the wire fraud counts against Defendant. (Doc. 90). The case then proceeded to a jury trial on the remaining ten counts on January 28, 2013. (Doc. 96).

Following a seven-day trial and two and a half days of deliberation, the jury found Defendant guilty on four counts, including the one count of conspiracy, two counts of wire fraud (specifically Counts 5 and 12 of the Indictment), and the one count of bank fraud. (Doc. 111). The jury found him not guilty on the six remaining counts, including four counts of wire fraud and the two counts of making false statements. (*Id.*) The Court denied Defendant's motion for judgment of acquittal and a new trial. (Doc. 151).

On July 11, 2013, this Court sentenced Defendant to one-day imprisonment, three-years on supervised release, and $1,715,650 in restitution. (Doc. 159). The Government and Defendant appealed. (Docs. 161, 163). Defendant subsequently moved to dismiss his appeal and filed the instant motion for relief. (Doc. 185, 186). The Government proceeded on appeal and the Sixth Circuit ultimately vacated this Court's sentence and remanded the case for re-sentencing. (Doc. 197). Accordingly, the Court withheld rendering a decision on the instant motion until Defendant had been re-sentenced. (*See* Min. Entry and Not. Order, Oct. 28, 2014). However, in the interim, the parties completed briefing and the Court advised that they would be given an opportunity to submit supplemental briefs after re-sentencing, if desired. (*Id.*)

4

Defendant was re-sentenced on December 15, 2014 to one-day imprisonment, five-years on supervised release, with the first twenty-four months on home detention, $1,715,650 in restitution, and a $250,000 fine. (Doc. 208). Defendant renewed his motion to vacate, reasserting the three grounds for relief based upon ineffective assistance of counsel. (Doc. 211). Neither party chose to submit supplemental briefs. The matter is now ripe for decision.[1]

## II. STANDARDS OF REVIEW

### A. Relief Under 28 U.S.C. § 2255

A court must vacate and set aside a judgment or sentence if it finds "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). Accordingly, a motion for relief under § 2255 must allege either: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid. *See, e.g.*, *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001) (citing *United States v. Addonizio*, 442 U.S. 178, 185-86 (1979)). In other words, "[r]elief is warranted only where a petitioner has shown 'a fundamental defect which inherently results in a complete miscarriage of justice.'"

---

[1] Following re-sentencing, the Government once again appealed the Court's imposed sentence. (Doc. 212). Defendant filed a motion in the appellate case to hold the appeal in abeyance until this Court decided the § 2255 motion. *See United States v. Paul Musgrave*, Case No. 15-3043 (6th Cir. Jan. 16, 2015). However, the motion for abeyance was denied without prejudice. (*Id.*)

5

*Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (quoting *Davis v. United States,* 417 U.S. 333, 346 (1974)) (emphasis added). "Claims of ineffective assistance of counsel are appropriately brought … under section 2255." *Griffin*, 330 F.3d at 736.

### B. Ineffective Assistance of Counsel

To demonstrate ineffective assistance of counsel, the defendant must make two showings: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The court is not required to "approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. Thus, if the defendant fails to satisfy <u>either</u> of the two prongs, his claim will fail. *Id*.

Under the <u>first prong</u> of the *Strickland* test, the defendant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 688. However, counsel's representation is deficient only where it falls "below an objective standard of reasonableness."[2] *Id*. There is no "checklist for judicial evaluation of attorney performance," but rather "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id*.

---

[2] *Strickland*, 466 U.S. at 689 ("the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial"); *Scott v. Mitchell*, 209 F.3d 854, 881 (6th Cir. 2000) ("the Constitution guarantees competent counsel and a fair trial, not perfection").

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 100 (1955)). The *Strickland* analysis is not an opportunity to second-guess trial counsel's sound strategic decisions merely because they were unsuccessful. *White v. McAninch*, 235 F.3d 988, 995 (6th Cir. 2000). Counsel's impeachment and cross-examination strategies are equally subject to this deferential standard. *See Moss v. Hofbauer*, 286 F.3d 851, 864 (6th Cir. 2002).[3]

Under the second prong of the *Strickland* test, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The defendant does not have to show that "his counsel's deficient conduct more likely than not altered the outcome in the case." *Goza v. Welch*, 579 F. App'x. 367, 370 (6th Cir. 2014). Instead, the question "is whether counsel's errors were serious enough to deprive the [defendant] of a proceeding the result of which was 'reliable.'" *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir. 1995) (quoting *Strickland*, 466 U.S. at 687).

---

[3] *See also*, *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002) ("[c]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel"); *Johnson v. Hofbauer*, 159 F.Supp.2d 582, 607-08 (E.D. Mich. 2001) ("[i]mpeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available"); *Gamble v. Warden, Lee Correctional Inst.*, No. 3:07-4049-HFF-JRM, 2009 WL 187816, at *8 (D.S.C. Jan. 26, 2009) ("[i]nadequate cross-examination will rarely be the basis for a finding of ineffective assistance of counsel") (citing *Hunt v. Nuth*, 57 F.3d 1327, 1333, n.4 (4th Cir. 1995)).

## III.  ANALYSIS

Defendant alleges that his trial counsel was ineffective for failing to: (1) impeach a key witness for the Government, former MFSB employee, Gary Enz, with his prior inconsistent statement; (2) confront Defendant's co-conspirator, Raymond Goldberg, about an e-mail that appeared to contradict his testimony; and (3) call a purported exculpatory witness, Brad Newton, to impeach Goldberg's credibility.  (Doc. 186). However, Defendant's claims do not meet the *Strickland* standard, as Defendant fails to show either that his trial counsel was ineffective within the meaning of the Sixth Amendment, or that, but for trial counsel's allegedly deficient performance, the result of his trial would have been different.

### A.  IMPEACHMENT OF GARY ENZ WITH AN ALLEGED PRIOR INCONSISTENT STATEMENT (CLAIM ONE)

First, Defendant claims that his trial counsel was ineffective for failing to impeach Gary Enz with his alleged prior inconsistent statements regarding his knowledge of Raymond Goldberg's ownership of ITBVI, which were memorialized in an investigating agent's "memorandum of interview."  (Doc. 186 at 12; Doc. 201 at 3).

*Deficient Performance*

An agent's written statements summarizing an interview are not attributable to the individual being interviewed.  *See, e.g., United States v. Brika*, 416 F.3d 514, 529 (6th Cir. 2005); *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) ("a witness may not be charged with a third party's characterization of his statements unless the witness has subscribed to them").  Accordingly, the contents of an agent's interview report are

8

<u>not the "prior statements" of the interviewed individual and cannot be used to impeach the individual on cross-examination if he subsequently testifies at trial</u>. *Brika*, 416 F.3d at 529 ("[s]uch documents have been deemed inadmissible for impeaching witnesses on cross-examination because they represent the 'investigator's selections, interpretations and interpolations'") (quoting *United States v. Nathan*, 816 F.2d 230, 236 (6th Cir. 1987)).

Here, the report containing the alleged "prior inconsistent statements" is a summary of Enz's September 28, 2011 interview with law enforcement, which report was written by the investigating agent. (Doc. 186-1 at 7). <u>Accordingly, the report is not attributable to Enz as his "prior statements" and would not have been admissible for impeachment purposes</u>. Further, trial counsel *did* specifically cross-examine Enz about statements made during the September 28, 2011 interview. (Doc. 120 at 64-66). When Enz was unable to recall what he had said to the agent, trial counsel appropriately attempted to use the report to refresh his collection. (*Id*. at 65-66). However, after reviewing the report, Enz testified that he was confused when he responded to the agent's question.[4] (*Id*.) Given these circumstances, trial counsel's decision not to question Enz further about additional statements in the report was <u>not unreasonable</u>.

---

[4] The exchange between trial counsel and Enz on cross-examination occurred as follows:

Q. [D]oes that appear to be a memorandum prepared by the SBA reflecting your September 28, 2010, conversation with Federal Agent Fox?
A. **I've never seen this form**, but it says that it's the Office of the Inspector General, Investigation Division, by Christopher Fox.
Q. And if I could direct your attention, please, to the fourth paragraph of page one …That paragraph indicates that you presented documents that were used to prepare the loan package to the federal agents and that those document included the Dayton International operating

9

Finally, trial counsel thoroughly impeached Enz by other, permissible means. In response to Enz's testimony that he had no knowledge of the connection between Goldberg and ITBVI, trial counsel pointed to the DITR Operating Agreement, which included a reference to Goldberg as owner of ITBVI. (Doc. 120 at 57-58). Additionally, trial counsel used statements from a memorandum <u>Enz himself drafted</u> and sent to the SBA, in which he appears to admit that he knew Goldberg owned ITBVI. (*Id*. at 66-70).

Thus, the jury was fully aware of possible inconsistencies between Enz's earlier statements and his trial testimony. Therefore, trial counsel's decision not to confront Enz further with his "prior inconsistent statement" does not amount to ineffective assistance. *Early v. United States*, Case No. 94-5086, 1994 WL 560969, at *1 (6th Cir. 1994) ("[c]ounsel's cross-examination of [the witness] was sufficient to put his credibility before the jury, and thus [counsel's] failure to impeach [the witness] with his [prior inconsistent statement] did not render [counsel's] performance ineffective").

Accordingly, Defendant does not overcome the presumption that trial counsel's decision not to impeach Enz with his alleged prior statements fell "within the wide range

---

agreement. Is that correct?
A. That's what it says, yes.
Q. **Does that refresh your recollection about when you got the operating agreement?**
A. **No. What it reminds me of is what I was thinking of - the agreement to repurchase the product, that agreement, not the operating agreement.**
Q. Okay. So in 2010 when you were interviewed on September 28th, you were confused about what the federal agent was asking you about; is that correct?
A. I was confused about what I submitted to the SBA.
Q. Okay. Thank you.

(Doc. 120 at 65:11 – 66:10) (emphasis added).

10

of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Therefore, Defendant fails to satisfy the first *Strickland* prong as to his first claim.

### *Prejudice*

Defendant also fails to show prejudice, as required under the second prong of *Strickland*. Defendant's argument that there is a reasonable probability that the jury would not have attributed the "ITBVI ownership scheme" to Defendant, had they been aware of the inconsistencies in Enz's testimony, fails for two reasons. (Doc. 186 at 17).

First, as the summary of Enz's interview was *inadmissible* as a prior inconsistent statement for impeachment, Defendant was not prejudiced by trial counsel's decision not to use it as such. Second, the jury *was* made aware of inconsistencies in Enz's testimony, as trial counsel's vigorous cross-examination was squarely aimed at undermining Enz's credibility. Although, apparently, the jury was not sufficiently persuaded by the thorough cross-examination, it unlikely that one additional statement (which was not even Enz's own) would have made a difference. Therefore, Defendant fails under the second *Strickland* prong to show a "reasonable probability" that the outcome would have been different had trial counsel attempted to (improperly) impeach Enz with the agent's report.

Accordingly, Defendant's first claim of ineffective assistance of counsel must be denied.

### B. CROSS-EXAMINATION OF RAYMOND GOLDBERG REGARDING THE "HARD CASH" E-MAIL (CLAIM TWO)

Defendant's second claim argues that trial counsel was ineffective for not confronting Goldberg with an e-mail (the so-called "hard cash" e-mail) and for not

11

introducing the e-mail into evidence. (Doc. 186 at 14; Doc. 201 at 5-6). Defendant suggests that the "hard cash" e-mail spoke to a key factor in the case – Defendant's credibility versus Goldberg's credibility, and that the e-mail would have established "that the government's primary witness was lying about one of the alleged schemes." (Doc. 186 at 14). Specifically, Defendant argues that "Goldberg's email establishes that he lied to Musgrave, his alleged co- conspirator, during and about the fraud that the government claims they perpetrated together, demonstrating that they were not co-conspirators at all." (Doc. 201 at 6). Defendant asserts that, but for this alleged error by counsel, the outcome of the trial would have been different. (Doc. 186 at 14). However, this argument ignores trial counsel's thorough cross-examination of Goldberg and merely second-guesses sound trial strategy.

### *Deficient Performance*

The Sixth Amendment right to effective assistance of counsel is not intended to guarantee perfection, but instead, ensure a fair trial. *Strickland*, 466 U.S. at 689. "Strategic choices of counsel are entitled to deference, and the cross-examination of witnesses falls within the area of tactics or strategy that ought not be subjected to second-guessing merely because that particular strategy proved to be unsuccessful." *Sowell v. Collins*, 557 F.Supp.2d 843, 886 (S.D. Ohio 2008).[5] Trial counsel's performance is not deficient or ineffective merely because, on cross-examination, counsel did not ask every

---

[5] *See also United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("the conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken").

12

possible question. *Yarbrough v. Johnson*, 490 F.Supp.2d 694, 738-39 (E.D. Va. 2007) ("[a] hindsight review of any cross-examination will unquestionably reveal an opportunity to ask one more question or highlight one more point"); *see Strickland*, 466 U.S. at 689 ("it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable"). Therefore, trial counsel's strategic decisions during cross-examination are "<u>virtually unchallengeable</u>." *Moss*, 286 F.3d at 864 (emphasis added).

Here, Defendant's trial strategy largely relied on undermining Goldberg's credibility. Trial counsel vigorously cross-examined Goldberg and squarely put the issue of his credibility before the jury. (Doc. 121). Trial counsel confronted Goldberg on several issues in an effort to discredit him, such as his ownership of arguably questionable business entities, the inconsistencies in his claims regarding the cost reduction versus a cash injection, his falsification of the shipping documents, his "sweet" plea deal with the Government in exchange for his cooperation, his history of unsuccessful business ventures, *etc*. (*Id*.) Essentially, trial counsel attempted to show that Goldberg was a "con man" and that Defendant was more of a victim than a co-conspirator. Ultimately, the strategy failed. However, the fact that the strategy failed does not mean that trial counsel's efforts were ineffective, even if, in hindsight, he could have done something different.

Further, the "hard cash" e-mail is not the "smoking gun" that Defendant makes it out to be. In the e-mail, Defendant and Goldberg were discussing another individual who wanted to ensure that the equipment would be loaded and shipped correctly. (Doc. 186-1

13

at 3-6). Goldberg's response was "[w]hat should assure him of delivery is my personal involvement of my own hards [sic] cash to the tune of 400k." (*Id.*)  Defendant now argues that this e-mail proves that Goldberg was lying when he "testified that Musgrave knew that [Goldberg] never intended to inject cash, knew the invoices were false, and in fact instructed Goldberg to falsify them." (Doc. 186 at 14).  However, this argument is based on the assumption that a jury would believe that Goldberg's statement about his "hard cash" investment was either an admission of his actual intent or that Defendant actually thought it was true.  In context, neither of these assumptions is apparent.  What the e-mail appears to show with greater certainty, however, is that Defendant and Goldberg were collaborating to discourage a well-intentioned individual from double-checking the shipment. (Doc. 186-1 at 3-4).

Given the totality of the circumstances, trial counsel was <u>not unreasonable</u> in opting for alternative avenues of impeachment.  Accordingly, Defendant's second claim fails under the first prong of *Strickland*.

### *Prejudice*

As trial counsel vigorously cross-examined Goldberg and the jury had ample opportunity to assess his credibility, Defendant fails to show a reasonable probability that this one e-mail would have changed the outcome of the trial.  Therefore, Defendant fails to demonstrate prejudice.

Accordingly, Defendant's second claim of ineffective assistance of counsel must be denied.

14

### C. TRIAL COUNSEL'S DECISION NOT TO CALL BRAD NEWTON AS A DEFENSE WITNESS (CLAIM THREE)

Defendant's third claim asserts that trial counsel was ineffective for failing to investigate a potential "exculpatory" witness, Brad Newton, and for failing to call Newton to testify at trial. (Doc. 186 at 15-16). However, Defendant's argument fails in that it mischaracterizes Newton as an "exculpatory" witness, and, further, fails to account for the strategic aspect of trial counsel's decision not to call Newton to testify.

*Deficient Performance*

"The decision not to call a particular witness is typically a question of trial strategy." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). "The Constitution does not oblige counsel to present each and every witness that is suggested to him." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2007) (citations omitted). However, when counsel is aware of plausible options relevant to a defendant's case, "he has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691 (emphasis added). In the Court's review of an ineffectiveness claim, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. (emphasis added).

Here, trial counsel was not ineffective for not calling Newton to testify. First, while Newton may have been able to offer some helpful testimony as a potential *impeachment* witness, this hardly warrants labeling Newton's testimony as

15

"exculpatory." Even if Newton had testified that Goldberg was a "fraudster" and that he had potentially lied on the witness stand, this would not exculpate Defendant.

Further, Defendant relies on a statement in his motion for a bill of particulars to argue that trial counsel admitted that Newton was an exculpatory witness. (Doc. 186 at 15). However, this reliance is misplaced. Trial counsel stated that certain individuals "are <u>potential</u> exculpatory witness [sic], and Mr. Musgrave is unable to interview these individuals or investigate their involvement without further identification." (*Id.*) (Emphasis added). Defendant states "that 'further identification' became clear once trial counsel learned that Brad Newton, initials 'B.N.,' was the former CFO of Rubber Solutions, as the indictment describes 'B.N.' as having prepared financial documents on behalf of Rubber Solutions and ITBVI." (*Id.*)

First, trial counsel stated that Newton was merely a "**potential** exculpatory witness."[6] (Doc. 50 at 5). Further, trial counsel's reference to Newton as a "potential exculpatory witness" was apparently made *before* counsel learned his identity. (*Id.*) It is

---

[6] Further, in quoting trial counsel, Defendant omits a sentence that may arguably cast doubt as to whether trial counsel was even referring to "B.N." as the "potential exculpatory witness." Trial counsel's actual statement in the motion for a bill of particulars was:

> The Indictment lists Mr. Musgrave's co-conspirators as "other individuals both known and unknown to the Grand Jury including individuals identified as 'H.M.' and B.N.'" It is unfair for the government to withhold the names of these co-conspirators. Moreover, and even more critically, Mr. Musgrave is entitled to know the names of any **unindicted co-conspirators who are not named in any fashion – <u>even by initials</u> – in the Indictment. These individuals are potential exculpatory witness**, and Mr. Musgrave is unable to interview these individuals or investigate their involvement without further identification.

(Doc. 50 at 5) (emphasis added).

16

entirely plausible that, upon "further identification" and subsequent investigation, trial counsel determined Newton was not the "exculpatory witness" he initially believed.

Additionally, Defendant argues and places great emphasis on the fact that "trial counsel never so much as contacted" Newton. (Doc. 186 at 15). However, trial counsel's decision not to investigate further is due significant deference if it was reasonable under the circumstances. *See Strickland*, 466 U.S. at 691. Here, Defendant states in his own declaration that he spoke "**frequently**" with trial counsel about Newton before trial counsel "told [Defendant] that he **decided** not to call Mr. Newton as a witness." (Doc. 186-1 at 2, ¶ 6) (emphasis added). Therefore, by Defendant's own admission, trial counsel gave due consideration to his decision not to call Newton as a witness.

Further, trial counsel had sufficient information about Newton available to him to make an informed decision that Newton would not be a favorable witness, without the need to engage in further investigation. *See Strickland*, 466 U.S. at 691 (counsel "has a duty to make reasonable investigations **or** to make a reasonable decision that makes particular investigations unnecessary") (emphasis added). As the Government amply sets forth, Newton's testimony was largely cumulative and, in some respects, would have significantly undermined the defense. (Doc. 200 at 39-45). Most compelling is that:

> Newton told the Australian Federal Police that everyone, including Musgrave, knew that the shredder was not coming from Australia, but instead directly from the manufacturer in Oregon. (R. 186-2, Dec. of B. Newton, Exh. 1, 3239.) Moreover, Musgrave even wrote an email to Newton in which he inquired whether the shredder was "coming directly from SSI in Oregon." (See R. 185, Govt. Exh. 7.5, 3157). Newton would have provided the government another witness who could have confirmed that Musgrave was lying about Goldberg's cash-injection and the source of the shredder.

17

(*Id*. at 44-45).

Therefore, on balance, trial counsel acted reasonably in determining that Newton was not an exculpatory witness, and that Newton's impeachment testimony was not worth the risk of undermining Defendant's credibility and his trial strategy.

Accordingly, Defendant's third claim fails to satisfy the first *Strickland* prong.

### *Prejudice*

Assuming, *arguendo*, that trial counsel's decision not to call Newton as a witness was ill-informed, Defendant still fails to show prejudice. As previously noted, even if Newton had testified and exposed Goldberg as a "fraudster," or a non-credible witness, that would not exculpate Defendant. Further, Defendant was not prejudiced because Newton's testimony as to Goldberg's history and credibility would have been largely cumulative. *See Davis v. Booker*, 589 F. 3d 302, 309 (6th Cir. 2009) ("undisclosed impeachment evidence is cumulative when the witness has already been sufficiently impeached at trial") (internal quotation marks omitted). Finally, Defendant was not prejudiced because Newton's testimony would have significantly undermined Defendant's defense. *Id.* (holding that even though trial counsel performed deficiently by failing to locate and call a witness, the defendant was not prejudiced where the witness's testimony would have been prejudicial to his case). Therefore, Defendant fails to show prejudice under the second prong of *Strickland*.

Accordingly, Defendant's third claim for ineffective assistance of counsel must be denied.

18

## IV.  CONCLUSION

Based upon the foregoing, Defendant Paul David Musgrave's motion to vacate pursuant to 28 U.S.C. § 2255 (Docs. 186, 211) is **DENIED**.  Further, having considered the standard under 28 U.S.C. § 2253(c), the Court **DENIES** the issuance of a certificate of appealability.

**IT IS SO ORDERED**.

Date:  3/13/15 　　　　　　　　　　　　　　　　　　　　　　　*s/ Timothy S. Black*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Timothy S. Black
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge