# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

<table>
<tr><td></td><td>Plaintiff,</td><td>:</td><td>Case No. 3:11-cr-183</td></tr>
<tr><td></td><td></td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td>District Judge Timothy S. Black</td></tr>
<tr><td>- vs -</td><td></td><td></td><td>Magistrate Judge Michael R. Merz</td></tr>
</table>

PAUL DAVID MUSGRAVE,

                            Defendant.          :

---

# REPORT AND RECOMMENDATIONS ON RESTITUTION

---

This criminal case is before the Court on remand from the United States Court of Appeals for the Sixth Circuit. *United States v. Musgrave,* Case No. 15-3388, 664 Fed. Appx. 540 (6th Cir. Nov. 30, 2016)(unpublished; copy at ECF No. 238).

The appellate court ordered this Court to "hold an evidentiary hearing to determine which assets the United States can reach to enforce the order of restitution." *Id.* at *540. After remand, District Judge Black referred the matter to the undersigned, pursuant to Fed. R. Crim. P. 59, to conduct the required evidentiary hearing and file a report and recommendations with proposed findings of fact and conclusions of law (ECF No. 240). Reference of this matter to a Magistrate Judge for proposed findings of fact and recommended disposition, subject to *de novo* determination by a District Judge, is expressly authorized by 18 U.S.C. § 3664(d)(6).

Subsequent to the referral, Barbara Musgrave, Defendant's spouse, was granted leave to intervene to defend her interests in the assets in question (ECF Nos. 244-45). The Magistrate

Judge took testimony on May 12-15, 2017, which has been transcribed (ECF Nos. 263, 264).

Briefing was completed August 14, 2017, and the remanded matter is therefore ripe for decision.

The Sixth Circuit set forth the legal standard to be applied to the question on remand:

> The Mandatory Victim Restitution Act (MVRA) mandates restitution for offenses "committed by fraud or deceit," such as Musgrave's. 18 U.S.C. § 3663A(c)(1)(A)(ii). A restitution order under the MVRA "is a lien in favor of the United States on all property and rights to property of the person fined as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code of 1986." 18 U.S.C. § 3613(c); *see also* 26 U.S.C. § 6321 (Internal Revenue Code section stating that nonpayment of any tax demand "shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person"). To determine the reach of the MVRA, therefore, we look to how courts have applied the federal tax lien statute.

> The Supreme Court has instructed that, because property rights depend on state law, courts apply the federal tax lien statute in two steps: "We look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Drye v. United States*, 528 U.S. 49, 58, 120 S. Ct. 474, 145 L. Ed. 2d 466 (1999); *cf. Morgan v. Comm'r*, 309 U.S. 78, 80, 60 S. Ct. 424, 84 L. Ed. 585 (1940) ("State law creates legal interests and rights. The federal revenue acts designate which interests or rights, so created, shall be taxed.").

> The first step of the *Drye* analysis asks how much effective control over the property in question state law provides to the person owing payment. "[I]n determining whether a federal taxpayer's state-law rights constitute 'property' or 'rights to property,' '[t]he important consideration is the breadth of the control the [taxpayer] could exercise over the property.'" *Drye*, 528 U.S. at 61 (quoting *Morgan*, 309 U.S. at 83). This state-law analysis is functional, not formalistic; it considers "the realities" of the defendant's interest

and "the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them." *United States v. Craft*, 535 U.S. 274, 279, 122 S. Ct. 1414, 152 L. Ed. 2d 437 (2002).

In *Craft*, the Supreme Court considered whether a federal tax lien could attach to a spouse's interest in a tenancy by the entirety, Michigan's form of joint property ownership between spouses. *Id.* at 283. To determine the taxpayer's effective control of the property under state law, the Court identified which specific rights Michigan law granted to the taxpayer with respect to the property. The Court identified these rights with considerable granularity, finding that the taxpayer had:

> [T]he right to use the property, the right to exclude third parties from it, the right to a share of income produced from it, the right of survivorship, the right to become a tenant in common with equal shares upon divorce, the right to sell the property with the [spouse]'s consent and to receive half the proceeds from such a sale, the right to place an encumbrance on the property with the [spouse]'s consent, and the right to block [his spouse] from selling or encumbering the property unilaterally.

*Id.* at 282.

After identifying the person's state-law property rights, courts must next determine whether those rights qualify as "property" or "rights to property" under the federal tax lien statute (and thus under the MVRA). This inquiry is governed by federal law, which may override state-law exemptions or legal fictions and is not bound by determinations of the state courts on similar questions. *Id.* at 288-89. The language of the federal tax lien statute "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *Id.* at 283 (quoting *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 719-20, 105 S. Ct. 2919, 86 L. Ed. 2d 565 (1985)).

The Supreme Court's decisions provide guidance as to which state-law rights qualify as "property" or "rights to property" under the

broad language of the federal tax lien statute. *Craft* suggested that the rights to use property, receive income produced by it, and exclude others from it may be sufficient by themselves to qualify, even without the right of unilateral alienation. *Id.* at 283-84. Combined with the right to alienate with a spouse's consent and the right of survivorship, *Craft* held that the rights granted by Michigan's tenancy by the entirety did qualify, permitting federal tax liens to reach property that Michigan law did not permit state creditors to reach. *Id.* at 283-85, 288. *Drye* held that an heir's interest in his mother's estate qualified for attachment despite his disclaimer of interest permitted under Arkansas law. *Drye*, 528 U.S. at 60, 120 S.Ct. 474. Similarly, a state law permitting retroactive renunciation of a marital interest does not foreclose federal tax liability. *Id.* at 59, 120 S.Ct. 474. The Court has also held that a right to withdraw all the proceeds from a joint bank account and a right to compel an insurer to pay the cash value of a life insurance policy both qualified for federal tax liens, even though state law shielded those rights from other creditors' liens. *Id.* at 58–59, 120 S.Ct. 474. By contrast, a federal tax lien cannot attach to proceeds unavailable to a taxpayer in his lifetime. Id. These federal-law precedents govern the reach of the MVRA.

*United States v. Musgrave*, 664 Fed. Appx. 540, 542-43 (6th Cir. 2016).

**Recommended Findings of Fact**

The Magistrate Judge recommends the Court adopt the following findings of fact which are proven by a preponderance of the evidence presented. In constructing this set of factual findings, the Magistrate Judge has included every finding proposed by any of the parties which is appropriately supported by evidence without attempting to decide its relevance or materiality; those questions are reserved for the analysis section below.

Defendant Paul David Musgrave[1] was born in 1954 and is sixty-three years old. His spouse, Barbara Musgrave, was also born in 1954 and is sixty-two years old. They were married in 1978 and have three adult children. Since the 1980's, David and Barbara Musgrave have shared financial responsibility for their household expenses. David Musgrave is trained as an accountant and became a certified public accountant in 1985, although he lost CPA license as a result of his conviction in this case.

David Musgrave currently owns a fifty percent interest in M & M Investment Partnership which owns the real estate used by GMD Industries, LLC. He also owns a twenty percent interest in that corporation which does business as Production Screw Machine Company and makes turned metal products for the automotive, medical, and commercial industries. David Musgrave does financial, management, and other work for both companies. The other half of M&M Investment Partnership and the other eighty percent of GMD Industries is own by Harrison McQuinn, David Musgrave's stepfather. David Musgrave made a $200,000 capital contribution for his investment in GMD. These two companies are obviously closely held businesses. Because of that David Musgrave does not know the precise value of his interests in the companies and cannot easily sell them. The businesses have been listed for sale, but have not been sold.

Barbara Musgrave is a registered nurse who began working in that capacity in 1976, before her marriage to David, and is still working. When the Musgraves lived in Dayton, Ohio, Barbara Musgrave worked at Kettering Medical Center from 1976 to 2009. Toward the end of her employment with Kettering, she was earning between $70,000 and $80,000 per year. During that time she contributed to a personal retirement account through Kettering's employee retirement plan. When she left Kettering, she rolled that retirement account over into a TD

[1] Although Defendant's legal name is Paul David Musgrave, he is called "David."

Ameritrade individual retirement account ("IRA") which she continues to hold solely in her own name. Barbara Musgrave also holds, solely in her own name, a TD Ameritrade Roth IRA. David Musgrave did not contribute any money to the funds in these two accounts.

Barbara Musgrave's father, Robert Gulling, was employed in an executive capacity at the Timken Roller Bearing Company after his naval service in the Second World War. From sometime in the early 1980's until their deaths, Barbara Musgrave's parents gave gifts of money to her and to her three siblings which she always deposited in accounts solely in her name. Barbara Musgrave's mother died in 2005 and her father in 2008. After his death but before the end of 2009, Barbara Musgrave received approximately $630,000 in disbursements from her father's estate, all of which she deposited in a TD Ameritrade account in her sole name and to which she did not give David Musgrave access; he has not contributed to that account.

At the time of the hearing, Barbara Musgrave had a Scottrade investment account with an approximately $10,000 balance and a TD Ameritrade investment account with an approximately $620,000 balance. The money she received over the years from her parents appreciated significantly, but she spent from those accounts to buy her current home in Waxhaw, North Carolina, to pay for improvements to that home, to pay for David Musgrave's legal fees in this case, and for other expenses. On February 15, 2013, Barbara Musgrave changed the beneficiary on her TD Ameritrade accounts from David Musgrave to her three children.

In November 2008 David Musgrave organized Dayton International Tire Recycling, LLC ("DITR") as an Ohio limited liability company, intending to construct and operate a tire recycling plant in Troy, Ohio. David Musgrave owned eighty-one percent of DITR and Intercontinental Trading BVI ("ITBVI"), a company wholly owned by co-defendant Raymond Goldberg, owned nineteen percent of DITR. DITR agreed to purchase tire shredding and

recycling equipment and machinery from Rubber Solutions, another company owned by Goldberg and located in Australia, for approximately $2.3 million.

The DITR operating agreement called for an investment of approximately $340,000 from David Musgrave and $370,000 from ITBVI. To finance the remainder of the purchase price for the equipment, David Musgrave applied for a loan from Mutual Federal Savings Bank to be guaranteed by the United States Small Business Administration. The loan was ultimately approved and the bank disbursed the loan proceeds by wire transfer to Rubber Solutions bank account in Australia.

Despite receiving payment, Rubber Solutions never shipped the tire shredder, the key piece of equipment for the intended tire-shredding plant. When the shredder was not delivered, David Musgrave contacted several law-enforcement agencies, including local authorities, the FBI, the SBA Inspector General, the Securities Exchange Commission, and Australian authorities. He lost $300,000 of his own money and the Court has already found that "not a penny went into his own pocket." (Sentencing Tr., ECF No. 180, PageID 2859[2]).

On October 22, 2009, Barbara Musgrave purchased, by Warranty Deed as the sole owner, a home in Waxhaw, North Carolina, to which she and David Musgrave moved from the Dayton, Ohio, area. David Musgrave has no ownership interest in this property. Barbara Musgrave wanted to be closer to the couple's children, who live in the Charlotte, North Carolina, area. The total purchase price was $378, 500. Barbara and David Musgrave have continuously resided in this property since Barbara purchased it.

---

[2] The Magistrate Judge's Amended Standing Order for all referred cases provides in pertinent part "All references to the record in this Court must be to the filed document by title, electronic filing docket number, and PageID reference. (E.g., Defendants' Motion to Dismiss, ECF No. 27, PageID __ .)" The Government's briefing does not comply with this Order, but the record references herein have been converted to comply.

Barbara Musgrave paid the downpayment on the Waxhaw home with $187,000 from her investment account and financed the rest of the purchase price through a Deed of Trust with Bank of America, N.A. She then paid approximately $50,000 to $60,000 for improvements to the Waxhaw house and approximately $30,000 to have a swimming pool installed at that house; David Musgrave contributed nothing toward the improvements or pool, but has had unfettered access to the pool since it was installed. The Union County, North Carolina, taxing authorities have currently assessed the value of this property at $587,000.

Barbara Musgrave also had owned, solely in her own name, the Dayton, Ohio, area home where the couple resided before moving to Waxhaw. The funds for the purchase of that home also came from her investment account.

After moving to Waxhaw, Barbara Musgrave began working as a nurse at Novant Health where she worked as a surgical clinical coordinator and earned approximately the same amount as she earned per year at Kettering. Since 2009 she has contributed to a retirement account from her Novant earnings held through Fidelity Investments. She holds that account solely in her own name and the funds in it have been deducted from her pay at Novant Health. David Musgrave has not contributed to that account, either directly or by funds given to Barbara Musgrave to invest in it.

On May 26, 2011, Barbara Musgrave gave David a limited power of attorney for her three TD Ameritrade accounts. David Musgrave's authority under this POA is limited to the purchase and sale of securities as Barbara Musgrave's agent; he has no authority to make any transfers to himself or otherwise engage in self-dealing. Barbara Musgrave did not execute the section of this form POA permitting David Musgrave to receive a fee from the account and no

evidence was presented at the hearing that he had ever withdrawn any funds from any of these accounts or had any portion of them transferred to himself.

On December 3, 2011, David Musgrave and Raymond Goldberg were indicted on fifteen counts related to DITR and the failed purchase of equipment from Rubber Solutions (Indictment, ECF No. 6). A trial jury found David Musgrave guilty on four counts and not guilty on six. Goldberg pleaded guilty and was sentenced to three years of probation which was terminated early upon his de facto deportation; he has paid none of the $1.7 million in restitution. Judge Black sentenced David Musgrave to one day of incarceration, three years supervised release, and $1,715,650 in restitution. On appeal by the United States, the sentence was vacated. *United States v. Musgrave,* 761 F.3d 602 (6th Cir. 2014). On remand Judge Black sentenced David Musgrave to one day's imprisonment, twenty-four months home confinement, three additional years of supervised release, a fine of $250,000, and the same amount of restitution as before. This sentence was affirmed on the Government's appeal. *United States v. Musgrave*, 647 Fed. Appx. 529 (6th Cir. 2016).

At the time of David Musgrave's resentencing, the Court set a tentative payment plan of $2,000 per month plus $25,250 per quarter. After David Musgrave submitted financial disclosure forms, Judge Black concluded Barbara Musgrave's assets were available to David Musgrave to pay the amounts ordered and made the tentative plan final. The quarterly payment was stayed pending appeal on condition that a cash bond in the amount of the quarterly payment be posted. Barbara Musgrave has posted those amounts as they have become due. As noted above, the Sixth Circuit remanded the case for an evidentiary hearing.

In March 2017 Barbara Musgrave reduced her work hours from thirty-six hours per week to two to three days per week as needed by her employer. As of the time of the hearing in May

2017, she earned a net income of approximately $3,200 per month which was direct deposited into her bank account. The mortgage payment on the Waxhaw home is automatically withdrawn from the same account. David Musgrave takes a distribution of $6,000 per month from his businesses and does not contribute to the mortgage payment.

David and Barbara Musgrave's approximate monthly expenses are reflected in Government Exhibit ("GX") 7 and total $13,000 per month. After paying his credit card and monthly restitution amounts, David Musgrave contributes approximately $2,600 per month toward the $13,000 total. The money is paid by check drawn on David Musgrave's Wright-Patt Credit Union account and deposited into Barbara Musgrave's Charlotte Metro Credit Union account. After deduction of the amounts paid separately by David Musgrave (monthly restitution and credit card payment) and the amounts paid separately by Barbara Musgrave (mortgage, real estate taxes, property insurance, homeowner's association fee, car loan, and legal fees), the Musgrave's consolidated monthly expenses total approximately $5,200.

On January 13, 2010, Barbara Musgrave purchased and titled in her name a 2008 Harley Davidson Model FLTR motorcycle. David Musgrave had the exclusive use of this bike; Barbara Musgrave has never driven a motorcycle or had a motorcycle endorsement on her driver's license. Barbara Musgrave no longer owned the motorcycle as of the May 2017 hearing.

On May 27, 2016, Barbara Musgrave purchased and had titled in her name a 2016 Honda Accord that is used primarily by David Musgrave; he pays $785.37 in monthly loan payments for this vehicle through an automobile allowance provided through his businesses.

During the tax years 2011 through 2015, David and Barbara Musgrave filed federal income tax returns prepared by David and claiming "married, filing jointly" status. These returns cumulatively declared $329, 551 in criminal defense fees as business expenses of DITR.

The couple's 2015 tax return listed $25,800 in prior court-ordered restitution payments and $1,200 home confinement monitoring fees as DITR business expenses.

As of May 2017, David Musgrave is eligible to draw $1,140.70 in Social Security retirement benefits, but testified he does not intend to apply for such benefits until reaching seventy years of age. On April 17, 2017, Barbara Musgrave changed the listed beneficiary on her life insurance policy from David Musgrave to her three adult children. Soon thereafter David and Barbara Musgrave executed new wills with accompanying irrevocable trusts. Barbara Musgrave's will lists her three adult children as primary beneficiaries of her estate.

David Musgrave conceded he is able to pay at least $2,000 a month toward his restitution obligation.

The United States called FBI Agent Susan Sigler as a forensic accountant witness and proffered her as an expert. She is not a certified public accountant. She has only previously testified in a § 2255 proceeding in this Court, *United States v. Gregory Chew*, Case No. 3:09-cr-049. That proceeding happened before the undersigned and her testimony was related to mortgage fraud. She testified she did not recall ever being accepted as an expert witness in the area of forensic accounting or fraud examination in any federal or state proceeding.

**Recommended Conclusions of Law**

The Magistrate Judge recommends the Court accept the following propositions as correct statements of the law. As with the proposed findings of fact, the Magistrate Judge has included every proposition of law requested by any party which is supported by appropriate authority,

without implication about their applicability.  Application of law to fact is discussed in the analysis section below.

The Mandatory Victim Restitution Act, 18 U.S.C. § 3663A ("MVRTA"), requires the Court to order restitution to victims of federal crimes and provides "(d) [a]n order of restitution under this section shall be issued and enforced in accordance with section 3664."  In formulating a restitution order the Court is required to consider:

> (A) the financial resources and other assets of the defendant including whether any of these assets are jointly controlled;
>
> (B) projected earnings and other income of the defendant; and
>
> (C) any financial obligations of the defendant, including obligations to dependents.

18 U.S.C. § 3664(f)(2).  The amount of restitution is determined by the loss to the victim. *United States v. Navarette,* 667 F.3d 886, 887-89 (7th Cir. 2012).

An order of restitution made pursuant to 18 U.S §§3663, 3663A, or 3664 is a lien in favor of the United States on all property and rights to property of the person fined as if it were the liability for a tax assessed under the Internal Revenue Code of 1986.  18 U.S.C. § 3613(c). Whether a state-law right constitutes "property" or "rights to property under 26 U.S.C. § 6321 is determined by federal law.  *Drye v. United States*, 528 U.S. 49, 58 (1999); *United States v. Nat'l Bank of Commerce*, 472 U.S. 713 (1985).  State law controls in determining the nature of the legal interest that a taxpayer has in the property sought to be made subject to a restitution order.  *Aquilino v. United States*, 363 U.S. 509 (1960).

A restitution order may be enforced only against property that is the defendant's under the relevant state law.  *United States v. Dann*, 652 F.3d 1160 (9th Cir.2011).  A defendant's spouse is not liable for any part of his restitution obligation, although her income may be factored into the

calculation of the defendant's household expenses. *United States v. Brill*, 2007 U.S. Dist. LEXIS 56225 (E.D.N.Y. 2007).

18 U.S.C. § 3664(e) provides:

> Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

Because the underlying offenses occurred in Ohio and defendant is now a resident of North Carolina, the law of both States is relevant to the instant matter. Relevant Ohio law provides at Ohio Revised Code § 3103.04 "[n]either husband nor wife has any interest in the property of the other, except as mentioned in section 3103.03 of the Revised Code, the right to dower, and the right to remain in the mansion house after the death of either." Ohio Revised Code § 3103.07 provides that "[a] married person may take, hold, and dispose of property, real or personal, the same as if unmarried." Ohio Revised Code § 3103.08 provides "[n]either husband or wife, as such, is answerable for the acts of the other."

The Constitution of North Carolina provides in pertinent part:

> The real and personal property of any female in this State acquired before marriage, and all property, real and personal, to which she may, after marriage become in any manner entitled, shall be and remain the sole and separate estate and property of such female, and shall not be liable for any debts, obligations, or engagements of her husband, and may be devised and bequeathed and conveyed by her, subject to such regulations and limitations as the General Assembly may prescribe. Every married woman may exercise powers of attorney conferred upon her by her husband, including

> the power to execute and acknowledge deeds to property owned by
> herself and her husband or by her husband.

Article X, § 4. North Carolina General Statutes provide in relevant part "[n]o married person shall be liable for damages accruing from any tort committed by his or her spouse, or for any costs or fines incurred in any criminal proceeding against such spouse." N.C.G.S. § 52-12. The same General Statues further provide

> The real and personal property of any married person in this State,
> acquired before marriage or to which he or she may after marriage
> become in any manner entitled, shall be and remain the sole and
> separate estate and property of such married person and may be
> devised and conveyed by such married person subject to G.S. 50-
> 20 and such other regulations and limitations as the General
> Assembly may prescribe.

N.C.G.S. § 52-1.

N.C.G.S. § 32A-1, et seq., authorize granting a power of attorney. However, even a general power of attorney does not authorize the attorney-in-fact as agent to make a gift of the property, or to convey or transfer it without present consideration inuring to the principal. *Whitford v. Gaskill,* 345 N.C. 475, 480 S.E. 2d 690 (1997).

Regarding retirement accounts, the Ohio Supreme Court has held that the rights and obligations associated with pensions and retirement funds are contractual in nature and are subject to the Employee Retirement Income Security Act as amended by the Retirement Equity Act of 1984. *Hoyt v. Hoyt,* 53 Ohio St. 3d 177 (1990). Retirement accounts governed by ERISA are assets held in the name of the plan participant and are not subject to joint ownership.

In determining whether defendant's spouse is merely a nominee for him, the Court must apply state law. *Hill v.United States*, 844 F.Supp. 263, 270 (W.D.N.C. 1993)(quoting *Comer Family Trust v. United States*, 732 F.Supp. 755 (E.D.Mich. 1990). Factors that courts consider to determine whether a nominee status exists include: the defendant's treatment of the asset as

his own; the defendant's control over the title owner; the existence of any close relationship between the title owner and defendant; the use of the title owner's funds to pay personal expenses of the defendant; transfer of property from the defendant to the title owner for a nominal sum; and the fact that the title owner supported the defendant. *Comer,* 732 F.Supp. at 755; *Towe Antique Ford Foundation* v. *IRS,* 791 F.Supp. 1450, 1454 (D. Mont.1992), *aff'd,* 999 F.2d 1387 (9th Cir. 1993). A "[n]ominee theory allows a creditor to recover from a debtor where there seems to be a relationship between a debtor and an asset such that there is a concealed understanding between the debtor and the nominal owner that one is holding legal title for the other." *United States v. Toler*, 666 F.Supp.2d 872, 883 (S.D. Ohio 2009)(Marbley, D.J.).

A constructive trust is defined as "a duty or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust." *Roper v. Edwards*, 323 N.C. 461, 464 (1988)(*quoting Wilson v. Development Co.*, 276 N.C. 198, 211-12 (1970). North Carolina recognizes constructive trusts may be "imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or interest in, property which such holder acquired through circumstance[s] making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 198 (1970).

Under North Carolina law, an insurable interest is "one which furnishes a reasonable expectation of pecuniary benefit from the continued existence of the subject of the insurance." *N.C. Farm Bureau Mut. Ins. Co. v. Wingler*, 110 N.C.App. 397, 402 (1993). An insurable interest exists if the occurrence of the peril insured against would cause a named insured to suffer

a pecuniary loss. *Jerome v. Great American Ins. Co.*, 52 N.C.App. 573, 578 (1981). Title to property is not determinative as to whether or not an insurable interest in that property exists absent a specific condition in the policy. *Id*.

# Analysis

It is respectfully recommended that the Court apply the relevant propositions of law set forth above to the findings of fact as set forth below.

The Government contends that the residence at 8504 Cheverny Drive in Waxhaw, North Carolina, the three TD Ameritrade accounts, and the 2016 Honda Accord "should all be considered nominally and/or equitably owned and controlled by the defendant." (Post-Hearing Brief, ECF No. 276, PageID 6343.) The Government relies on the testimony of Agent Sigler who defined nominee ownership as "when an individual places an asset in someone else's name, usually someone close to them, so that they can enjoy the benefits of the asset without the asset['s] being able to be seized." (Tr., ECF No. 264, PageID 6065.) A common example in this Court's experience is drug dealers' placement of automobiles in the name of another person to prevent their seizure as a forfeitable asset in the event of arrest.

The Government asserts Ms. Sigler "established clear evidence of the existence of a *nominee relationship* between the defendant and his spouse." (Brief, ECF No. 276, PageID 6359; emphasis in original.) In *Toler, supra*, Judge Marbley of this Court held that "nominee theory is not recognized under Ohio law." 666 F. Supp. 2d at 883. He cited two Northern District cases which the United States relied on in *Toler* to support that theory, *Nantucket Vill. Dev. Co. v. United States*, No. 5:99 CV 230, 2001 U.S. Dist. LEXIS 1064 (N.D. Ohio Jan. 9,

2001), and *United States v. Gaumer*, No. 4:07 CV 1352, 2007 U.S. Dist. LEXIS 94633, 2007 WL 4365399 (N.D. Ohio Dec. 10, 2007), but noted that neither of them cited any Ohio case law adopting a nominee theory. *Nantucket* and *Gaumer* are also relied on by the Government here (ECF No. 278, PageID 6376), but the Magistrate Judge concludes Judge Marbley's distinction of those two cases is persuasive. The Government cites no Ohio case law explicitly recognizing a nominee theory. The Magistrate Judge recommends this Court follow *Toler* and conclude Ohio does not recognize a nominee theory.

The Government notes that Judge Marbley recognized in *Toler* that Ohio recognizes a somewhat related concept of equitable ownership where the person holding "bare legal title" to real estate is doing so not to conceal the identity of the true equitable owner, but as security for a payment, for example, in the typical Ohio land contract transaction. *Toler*, 666 F.Supp. at 884. This concept has no application to this case as there is no evidence Barbara Musgrave holds title to anything to secure payment from David Musgrave.

If this Court, in contrast to Judge Marbley, were to conclude that Ohio does recognize a nominee theory, the evidence does not establish that any of the assets in Barbara Musgrave's name are held by her as a nominee of David Musgrave. In *Spotts v. United States*, 429 F.3d 248 (6th Cir. 2005), the court identified six factors to be considered by the district court on remand to determine whether there was nominee ownership:[3]

> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

[3] Under Kentucky law, but the theory appears to be generalizable.

*Id.* at 253, n.2.  There is simply no evidence in this case that any of the assets held in Barbara

Musgrave's name were ever transferred to her by David Musgrave.  The Musgraves' pattern of

holding property separately long precedes this litigation and apparently has been in place since

early in their marriage.  Although there was no testimony on the point, it may well be that their

motivation has always been to protect Barbara's assets from David's business creditors, but even

if that motivation were proved, it would not show that she held assets in her name as his

nominee.

Agent Sigler testified that there was "no way" Barbara Musgrave could have amassed the

assets in her name without contribution from her husband, but that opinion was not grounded in

any analysis of underlying accounts.  For example, the United States could have but did not

subpoena Barbara Musgrave's employment records from Kettering Medical Center to determine

how much actual contribution she had made to her retirement account.  It is of course entirely

possible that Barbara Musgrave was able to contribute more than she otherwise would have to

those accounts because her spouse contributed more to the household expenses.  But that does

not mean that the United States as victim is entitled to have those household expenses

"reconstructed" so that it can receive part of the retirement funds.

The Government relies on "[t]he unrebutted expert testimony of Ms. Sigler. . ."  (ECF

No. 276, PageID 6360).  Federal Rule of Evidence 702 sets forth the requirements for the

admissibility of expert testimony as follows:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the
principles and methods reliably to the facts of the case.

Under the Federal Rules of Evidence as interpreted in *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.,* 509 U.S. 579 (1993), "the trial judge must ensure that any and all scientific testimony or

evidence admitted is not only relevant, but reliable." *Id.* at 589. To qualify as scientific

knowledge, an inference or assertion must be derived by the scientific method. *Id.* at 590. In a

case involving scientific evidence, evidentiary reliability will be based on scientific validity. *Id.*

at n. 9. Factors bearing on whether reasoning is scientifically valid include: can the theory or

technique be tested; has it been subjected to peer review and publication, what is the known or

potential rate of error, has it been generally accepted? *Id.* at 593-594. Ms. Sigler presented no

testimony to show that her opinion about Ms. Musgrave's lifetime earnings was based on any

scientific theory at all.

The gatekeeper language of *Daubert* is applicable to all expert testimony, regardless of

whether it is "scientific" or not. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999); *United*

*States v. Jones*, 107 F.3d 1147, 1156 (6th Cir. 1997); *see also United States v. Thomas*, 74 F.3d

676, 681 (6th Cir. 1996), and *Berry v. Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994). In *Thomas v.*

*City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005), the Sixth Circuit affirmed a grant of summary

judgment where plaintiffs expert on police practice inferred a policy from the number of

excessive force claims filed; the court found opinion was conclusory. "[B]eing an expert does

not lessen the burden one has in rebutting a motion for summary judgment. In fact, '[i]f the

witness is relying solely or primarily on experience, then the witness must explain how that

experience leads to the conclusion reached . . . and how that experience is reliably applied to the

facts. The trial court's gatekeeping function requires more than simply taking the expert's word

for it.'" *Id*., citing Advisory Committee note to Fed. R. Evid. 702 (some internal quotation marks omitted).

The Court allowed Ms. Sigler to testify to her conclusion about Barbara Musgrave's retirement accounts without engaging in the full-blown *Daubert* analysis that would have been required if she had been proffered as a forensic accounting expert in a jury trial. But upon analysis here after the testimony was given, the Magistrate Judge does not believe her testimony qualifies as expert forensic testimony on the subject on which it was offered, to wit, whether Barbara Musgrave could have accumulated the amounts in her retirement accounts without contribution from David Musgrave. To accept her conclusion without more (e.g., any examination of the employment records) would amount to taking her word for it – accepting a pure conclusion without a showing of relationship to underlying information.

At various points in its briefing, the United States emphasizes David Musgrave's access to some of the assets held in Barbara Musgrave's name, to wit, the Waxhaw house with its in-ground pool and the Honda Accord. But it has not proven that he has any **legal** control over those assets. He could not mortgage or sell the house or the car without her consent.

Some emphasis is placed by the United States on the limited power of attorney respecting the Ameritrade accounts which Barbara Musgrave has granted to her husband. But there was no proof that he has or could ever legally use those powers to benefit himself or to pay the restitution order in this case. Whether he might have some rights to division of his wife's property in the event the marriage was dissolved is also beside the point because he has no such rights while the marriage is intact.

In its Reply Brief, the United States emphasizes the English common law basis of American property law, citing 2 William Blackstone, Commentaries on the Laws of England (ECF No. 279, PageID 6388).  Blackstone has this to say on the subject:

> A sixth method of acquiring property in goods and chattels is by marriage, whereby those chattels which belonged formerly to the wife are by act of law vested in the husband with the same degree of property and with the same powers as the wife, when sole [unmarried], had over them.
>
> This depends entirely on the notion of an unity of person between the husband and wife; it being held that they are one person in law, (i) so that the very being and existence of the wife is suspended during the coverture, or entirely merged or incorporated in that of the husband.

COMMENTARIES, edited by Thomas M. Cooley (1884), Vol. 1, p. 433 (Lawbook Exchange Reprint 2003).   Blackstone is undoubtedly the authority most relied on for statement of the common law at the time the United States was formed.  However, this portion of the common law was displaced by the Married Women's Property Acts, adopted in America as early as 1809 in Connecticut and embodied in § 4 of the North Carolina Constitution quoted above.[4]


**Conclusion**


Based on the foregoing analysis, it is respectfully recommended that the Court enter a restitution order requiring David Musgrave to pay $2,000 per month.  The supersedeas bond should be dissolved and the cash returned to Barbara Musgrave who posted it.

---

[4] The Government also asserts in its Reply Brief that "[o]n November 21, 1789, North Carolina became the twelfth colony to declare independence from the Crown." (ECF No. 279, PageID 6388).  Actually, that was the date on which North Carolina ratified the Constitution.  North Carolina claims to have been the first colony to declare independence by virtue of a declaration to that effect on May 20, 1775, at Mecklenburg.

November 30, 2017.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).